UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| AARON GABBARD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 22-058-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AMAZON.COM SERVICES LLC, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Aaron Gabbard claims that Defendant Amazon.com Services LLC set him up for failure after he requested accommodations for his disabilities.  But Amazon contends that, despite its best efforts to help Gabbard succeed, he simply did not meet the expectations required for his position and was fired.  Gabbard filed suit in the Bath Circuit Court alleging discrimination claims under the Americans with Disabilities Act, the Family and Medical Leave Act, and the Kentucky Civil Rights Act.  He also claims that Amazon provided false information to the Kentucky Department of Unemployment Insurance, which prevented him from obtaining unemployment benefits.

Because there is no genuine issue of material fact that Gabbard was fired due to his performance—not his alleged disabilities or his requests for accommodations—summary judgment will be granted in favor of Amazon with respect to the discrimination claims. However, because Amazon failed to develop any argument with respect to the false statements claim, which is based in state law, summary judgment will be denied on that claim and the remainder of the case will be remanded to state court.

- 1 -

## I.       Background

Plaintiff Aaron Gabbard (the "plaintiff" or "Gabbard") began his career at Amazon.com Services LLC ("Amazon" or the "defendant") as a customer service associate ("CSA") at the Winchester, Kentucky call center in June 2013.  [Record No. 32-1, pp. 9-10]  Gabbard reports that, while he led that position, he would sometimes need to leave work due to anxiety.  *Id.* at 16.  Early on, he was not required to ask in advance for time off.  Instead, if he had time off available for use, he would "put it in the system and go on."

Gabbard was promoted to the remote position of customer relations specialist ("ECR") on April 1, 2018.  *Id.* at 19-20.  Brian Ferguson was assigned as Gabbard's manager.  According to Gabbard, he and Ferguson discussed Gabbard's anxiety often and Ferguson told him: "Hey, if you need some time off, take the time off, I'll provide you with those accommodations or voluntary time off if you need it…. [W]e all … need a break and I know you get anxiety."  *Id.* at 20.

Jenna Foster was assigned as Gabbard's manager approximately six months into his role as ECR.  *Id.* at 22.  Foster never made any negative comments about Gabbard's alleged medical conditions or their impacts on his performance as an ECR specialist.  Gabbard thought that Foster criticized him too harshly at times and he explained to her that "simply [he had] to be treated slightly different."  Gabbard and Foster had discussions about his attendance of therapy and trials of different medications.  Foster would allow him to take time off when he did not feel well.  *Id.* at 23.

Foster placed Gabbard on a 60-day Development Plan on March 1, 2019.  Foster outlined the following performance concerns:

Throughout 2018 there were concerns on bias for action and delivering results from [Gabbard's] end.  While [he] would enthusiastically take on new projects, [he] would often get bogged down by the details and lose focus on getting the project to completion, the result of this being that not only [he was] delaying a resolution for [the] customer but also delaying improvements for [Amazon's] team and business partners.  With clear direction and consistent follow-up, [he was] completing tasks, but as a Level 4 ECR specialist, there's an expectation that [he] will be able to perform well in a sometimes ambiguous space. . . .

Gabbard acknowledged that Foster would "get onto [him] about things," which included sending an email in violation of company policy.  *Id.* at 23, 31.  He denied, however, that he had any performance issues other than making grammar and spelling mistakes due to his alleged dyslexia.  *Id.* at 27-29.

Gabbard apparently met the goals of the March 2019 Development Plan and held the ECR position until April 2020, when he applied for and received a temporary position as acting customer escalation insight project manager ("CEI").  *Id.* at 32.  This position also was remote and involved a change in responsibilities.  While other employees told Gabbard they considered it "an internal promotion," it did not result in a change in Gabbard's pay.  *Id.* at 33.

Nicolette Kyte was Gabbard's manager while he held the acting CEI position.  His scheduled work hours were 9:00 a.m. to 5:00 p.m., Monday through Friday.  Gabbard and Kyte often communicated by instant messages through Amazon Chime.  *Id.* at 36.  At some point, Gabbard told Kyte that he had anxiety and hypersomnia, which he described as an "inability to stay awake during certain times."  *Id.* at 36.

On May 5, 2020, at 8:46 a.m., Kyte messaged Gabbard: "Good morning!"  Gabbard responded at 11:29 a.m., stating, "Hey, I had to put time in today[.]  I'm not feeling well at all[.]  [M]y eyes are swelled up like I got stung by a bee or something."  [Record No. 32-2, p.

- 3 -

26]  Kyte told Gabbard that she was worried when she did not see him online and realized that he did not have her cell number "for texts in cases like this."  *Id.*

Gabbard messaged Kyte on May 12, 2020, at 9:50 a.m., advising her that he was taking a half day off to "get things straight with [his] place."  Kyte responded: "Make sure you are communicating prior to shift on any changes.  Just like in ECR—text or chime so I know.  Also, understand prioritization in CEI is critical as we do have deadlines for work—so if you have any training/low priority meetings set this week we may need to push those to make up for the half day, etc."  Gabbard responded, "Okie Doke.  May be back in sooner just had a bunch of things cone [sic] up I needed to take care of."  *Id.* at 29.

The following week, Gabbard asked Kyte, "Would you be able to have our Daily Sync up a little earlier today?  I was going to see if I could leave out a few hours earlier."  *Id.* at 33.  Then, on May 28, 2020, Gabbard advised Kyte that he was late due to oversleeping.  Rather than notifying her immediately, he waited until after he clocked in for work to log his missed time.  Kyte responded, "After you logged in—why didn't you ping me to let me know you had been late?  We've had so many conversations about the need to notify me when these things occur.  In this case, obviously it wasn't an option prior to it occurring—but as soon as you know is what we've discussed in the past."  *Id.* at 36.

Gabbard responded, "I entered my time as soon as I got in, I thought for sure that would notify you to let you know that I entered the time, I'll be more direct and ping you if anything at all pops up."  Kyte admonished Gabbard that "entering time is the expectation only to cover your time off."  She further advised him to contact her directly using whatever method he could get to first.  Gabbard stated that he had been embarrassed about oversleeping.  Kyte told him,

"embarrassment aside, your focus always should be to do what you need to do to ensure you are following policy." *Id.*

Later that day, Gabbard contacted Doug Berry, Amazon's Senior Human Resources Partner, and advised him that he had a medical condition he believed was affecting his attendance.   [Record No. 32-2, p. 3]   Gabbard wanted to know if there were any accommodations that he could get for his condition or if Berry could do anything to help. Berry instructed Gabbard to contact Amazon's Disability Leave Services ("DLS") department, which would be able to assist him in submitting an intermittent leave request under the Family and Medical Leave Act ("FMLA").[1]   [Record No. 32-2, p. 3]   Berry maintains that he did not inform Kyte that Gabbard contacted him concerning an accommodation. *Id.*

Gabbard messaged Kyte on June 1, 2020, at 11:28 a.m., stating, "Hey I got a family emergency[.]   I'm going to have to take an early [lunch].   Someone's set my grandmother's house on fire...." *Id.* at 39.   Kyte responded sympathetically, but asked Gabbard to text if his plans for returning changed.   Gabbard subsequently advised Kyte that his grandmother was previously deceased, that the house was uninhabited, and indicated that other family members were present at the scene.   Gabbard continued to communicate with Kyte intermittently throughout the day, but it is unclear what time he returned to work.

On June 4, 2020, at 10:00 a.m., Kyte emailed Gabbard a Final Written Warning, which stated, in part:

> As a result of your recent attendance behavior, specifically, not adhering to the
> call-in procedure for notifying your manager of absences and/or missed hours,

---

[1]   Gabbard testified at his deposition that Berry told him that he would "just have to go find the information out on [his] own." [Record No. 32-1, p. 41] However, it appears that the defendant has abandoned that position, as his response to the plaintiff's motion for summary judgment confirms that Berry referred him to DLS on May 28, 2020. [Record No. 34, p. 3]

and not adhering to scheduled work hours, you are being issued a Final Written Warning.  Also, based on the number of recurring violations and your failure to correct your behavior after repeated conversations with your manager, effective June 4, 2020, CEI will release you from your acting CEI role and you will return to your former ECR Associate position.  Additionally, your current trend is not meeting expectations and transferring is not supported at this time.

[Record No. 32-2, p. 7]  The Final Written Warning described six occurrences during May 2020 in which Gabbard either was absent, arrived late, or signed out early, and did not provide proper notification to Kyte.[2]  Gabbard was returned to his ECR position and Ferguson resumed his role as Gabbard's direct supervisor the following day. [*See* Record No. 32-3, p. 3.]

Gabbard submitted an accommodation request through Amazon's employee self-service portal on June 4, 2020, at 10:46 a.m.  [Record No. 32-5, p. 2]  He stated that he suffered from anxiety, hypersomnia, and ADHD and requested time off during the day to address those conditions.  [Record Nos. 32-1, pp. 59, 135; 32-5, p. 2]  Gabbard did not provide any accompanying medical documentation at that time.  He explained during his deposition that he "would need time off during the day in case [he] had flare-ups of anxiety or bouts of like drowsiness, because sometimes drowsiness would cause extreme depression, and then other times it could be just as simple as taking a 15-minute break and just fall asleep to, you know,

---

[2]     In addition to the incidents already described, the final written warning included the following:

Thursday, May 14: 47 min late for start of shift.  You did not notify your manager; this was discovered during a MyTime audit on May 18th.

Friday, May 15: 2 hrs 49 min late for shift start—no notification until your 1:1 meeting with your manager 3hrs into your shift.  No notification or mention to manager prior to this meeting.  Your manager spoke with you again detailing notification expectations prior to shift start, and that this is HR policy for tardies/absences.

[Record No. 32-2, p. 7]

anything.  Rain drops on the car would cause [him] to kind of trigger into these bouts of quick power naps or just shutting down."  *Id.*

DLS approved Gabbard's request for intermittent medical leave on June 17, 2020, after receiving documentation from Gabbard's physician.  [Record No. 32-5, p. 3]  The accommodation was backdated to May 4, 2020.  The accommodation was revised accordingly after DLS received additional documentation from Gabbard's physician indicating that Gabbard would need to use his intermittent leave up to eight hours per week.  [Record No. 32-5, p. 3]

Gabbard also was placed on a 60-day Development Plan on or around June 17, 2020. The defendant maintains that the Development Plan came as a result of its "mandatory mid-year review which was focused on [Gabbard's] performance in the ECR role from January 1, 2020 to June 2020."  The Development Plan highlighted several issues with Gabbard's work and indicated that he "ranked near the bottom of the ECR specialists based on the first half of his 2020 performance."  [Record No. 32-3, p. 3]

The Plan noted, for example, that in the first quarter of 2020, Gabbard oversaw a project to provide data and guidance regarding ECRs' use of the Nautilus tool.  The project should have taken approximately two weeks, but Gabbard took six weeks to complete it.  *Id.* at 9. Additionally, Gabbard followed unnecessary tangents during the project and had to be redirected.  The Plan also stated that, prior to transitioning to the acting CEI role, Gabbard's manager met with him to "discuss the importance of improving [his] communication, following directives, and meeting timelines."  Ultimately, Gabbard's failure to deliver results and to communicate was deemed inconsistent with the standards required of the ECR team.

- 7 -

The Development Plan set out three goals: (1) maintain at or above team average metrics and communicate one hundred percent of all missed time; (2) complete two projects, including one selected through the standard insight process and the other presented by his manager; and (3) career development.  Each goal had a correlating measurement, which Amazon contends was commensurate with the average requirements of Gabbard's team of ECR specialists.  [Record Nos. 32-3, p. 4; 32-6, p. 4] As part of the Development Plan, Gabbard met with Brian Ferguson regularly and was assigned a mentor, Teneika James.  [Record No. 32-2, pp. 51-53; 32-3, p. 4]

Gabbard testified that, as of September 2020, he thought he had met the goals of the Development program.  [Record No. 32-1, p. 84]  But evidence submitted by Amazon indicates that he continued to struggle.  [Record No. 32-3, p. 4]  Berry indicated in an email to his supervisor, Spencer Didion, that Gabbard demonstrated an inability to manage multiple priorities, failed to follow simple instructions, and required several follow ups and manager intervention.  Regarding career development, Gabbard had simply imported old feedback from Amazon Forte without making any edits or putting the information into his own words.  When asked to explain his performance, Gabbard simply stated that he did not know what to do and asked whether other team members were having to perform that task.  [Record No. 32-3, p. 12]

Gabbard was assigned a new manager, Erika Martinez, on September 17, 2020, and the Development Plan was extended through October 28, 2020.  [Record No. 32-6, p. 6]  The goals remained the same except Gabbard's project load was reduced to one.  Additionally, he did not have to communicate his missed time in advance, even though doing so was a job requirement for customer service specialists.

Gabbard's laptop computer was exchanged for a new computer shortly after his return to the ECR role pursuant to Amazon's "systemic hardware upgrade." [Record No. 32-3, p. 5] The new computer blocked certain websites and software, such as ProWritingAid, that Gabbard had previously found helpful in performing his job. [Record No. 32-1, p. 106] Gabbard spoke with Martinez, who advised him that he could continue using his laptop and accessing the sites and software if he could get them to work. *See id.* 140. He contends that, when he told he her he could not, "that was basically it on that."

On October 12, 2020, Martinez had a one-on-one meeting with Gabbard in which she advised Gabbard that he was falling short of expectations with respect to all three goals. Further, he was trending toward noncompletion of the project goal, as he had just started to take action despite the approaching deadline. Martinez remarked, however, that Gabbard had come to the meeting with a positive attitude and had provided examples and updates to his Development Plan deliverables. She reminded him that such a level of communication and execution was constantly needed from ECR specialists. *Id.* at 13.

Gabbard contacted DLS on October 14, 2020, but did not request an accommodation at that time. [Record No. 32-5, p. 3] On October 26, 2020, Martinez informed Gabbard that he had failed to meet expectations with respect to metrics goals as outlined in the Development Plan. *Id.* at 16. Gabbard had been audited twice that week, resulting in one passing score and one critical failure. Additionally, Gabbard failed to email Martinez a weekly recap of his previous week's progress as Martinez had instructed him in a one-on-one meeting on September 28, 2020. Martinez advised Gabbard that he was not on track to complete the Development Plan and would share the next steps in the coming days. *Id.* at 17.

Gabbard subsequently was placed on a PIVOT, which presents an underperforming employee with the option to stay at Amazon and receive coaching to improve performance or voluntarily leave Amazon with severance. [Record No. 32-1, p. 100]   However, Gabbard submitted an accommodation request to DLS on October 27, 2020, seeking vocational coaching and assistance with technology.  [Record No. 32-5, p. 3]  Amazon agreed to pause the PIVOT plan and provide Gabbard with vocational coaching services up to 60 minutes per week for three months.

Vocational coach Matthew Wilson worked with Gabbard and helped him with "time management skills that [Gabbard] had never previously thought about."  [Record No. 32-1 p. 109]  While Gabbard could not use his old laptop as he wished, he was permitted to access his desired software and websites on a separate computer.  His vocational coach and IT professionals provided training to assist with maneuvering between the two systems. The accommodations team also noted that Gabbard was able to use a SharePoint site in lieu of Microsoft, which Amazon had blocked

Martinez and Gabbard continued to have one-on-one meetings and Martinez instructed Gabbard to select a new project that could be completed within 30 days.  Martinez held Gabbard accountable to "[t]he same goals and expectations required of all ECR Specialists." [Record No. 32-6, p. 18]

By December 1, 2020, Gabbard had failed to select and begin working on a project. Additionally, he had critically failed an audit the previous week.  Other errors included failing to include an email alias for proper tracking and resolving a contact without responding to the customer.  Martinez reminded him of the importance of proper communication with customers

and business teams for quick resolution and balancing all expectations of an ECR specialist. *Id.* at 21.

On December 15, 2020, Martinez paused the PIVOT for an additional 30 days, with an end date of January 11, 2021. *Id.* at 23. She observed that Gabbard had been highly focused on metrics that month, but had lost focus on his project. She encouraged Gabbard to continue working with his vocational coach. Gabbard received positive feedback with respect to metrics from Martinez on December 31, 2020, and she noted that he had received a positive comment from a customer. *Id.* at 25. Nevertheless, there had not been any movement regarding next steps in his project.

The PIVOT was reinstated in January 2021. Gabbard was given four goals, which were to be met by February 26, 2021. [Record No. 32-6, p. 4] Similar to the Development Plan, the metrics were based on the average metrics of Gabbard's team of ECR specialists. Amazon maintains that Gabbard still was not meeting the PIVOT goals and it extended the end date to April 5, 2021, to allow him additional time to utilize the tools shared with him during vocational coaching. *Id.*

Gabbard failed to meet two of the four goals by the end of the PIVOT period. Specifically, and according to Martinez, he failed to follow policies regarding contact handling processes and contacts being appropriately escalated. Further, he

> last worded a customer on their first contact with ECR, against guidelines in the ECR Repeat Customer/Last Word Policy and separately never contacted a customer to let them know [he was] handling their escalation, against guidelines in the Phone First Policy. He badly failed to meet the CPH expectation (.80), with a February CPH of .46 and March CPH of .48, with a cumulative score of .47

*Id.*

Gabbard appealed Martinez's assessment of his performance.  However, a three-person board composed of neutral Amazon employees upheld Martinez's decision.  As a result of Gabbard's inability to complete the PIVOT, his employment was terminated on or about May 25, 2021.  [Record No. 32-3, p. 5]

Gabbard filed a complaint with the EEOC, which issued a notice of right to sue on November 18, 2021.  Gabbard then filed suit in the Bath County Circuit Court on February 16, 2022, alleging that Amazon discriminated against him based on his alleged disabilities.  Specifically, he contends that Amazon's actions constitute a failure to provide reasonable accommodations and wrongful termination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12010 *et seq*., and the Kentucky Civil Rights Act, K.R.S. § 344.  He also makes a general allegation that the defendant's actions violate the Family and Medical Leave Act, 29 U.S.C. § 2601, and that the defendant falsely reported to the Kentucky Department of Unemployment Insurance that he voluntarily left his employment, causing him to lose unemployment benefits and payments.

Amazon removed the matter to this Court on March 11, 2022, and filed a motion for summary judgment on March 6, 2023, which has been fully briefed.

## II.    Standard of Review

"Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  The moving party bears the initial burden of pointing out that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the movant meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue

for trial." *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)).   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   The Court views all evidence in the light most favorable to the nonmoving party. *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing *Anderson*, 477 U.S. at 252).

### III.   Discussion

### A.   Failure to Accommodate

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating "against a qualified individual on the basis of [a] disability."   42 U.S.C. § 12112(a).  An employer discriminates within the meaning of § 12112(a) when it fails to make "reasonable accommodations to the known physical or mental limitations" of an otherwise qualified employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation" of its business. *Id.* § 12112(b)(5)(A).   The language of the Kentucky Civil Rights Act ("KCRA"), K.R.S. § 344.010 *et seq.*, mirrors that of the ADA.  Accordingly, claims brought under the KCRA are interpreted consistently with those brought under the ADA.  *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007).  *But see Watkins v. Shriners Hosps. for Children, Inc.*, 2020 WL 2309486 (E.D. Ky. May 8, 2020) (concluding that KCRA did not incorporate the 2008 ADAAA changes).

### 1.   Amazon engaged in an interactive process.

"'Once an employee requests an accommodation, the employer has a duty to engage in an interactive process' to try to determine whether the employer can accommodate the

- 13 -

employee's disability."[3]  *King v. Steward Trumbull Mem. Hosp., Inc.*, 30 F.4th 551, 564-65 (6th Cir. 2022) (quoting *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2021)). This requires the employer to participate in "good faith" and conduct an "individualized inquiry" into possible accommodation.  *Id.* (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014)).

Gabbard appears to have abandoned his claim that Amazon failed to engaged in an interactive process, as he did not respond to the portion of Amazon's motion for summary judgment regarding this claim.  Regardless, Amazon has identified ample evidence indicating that it *did* engage in an interactive process each time it was alerted of Gabbard's request for an accommodation, whether formal or informal.

Gabbard testified during his deposition that supervisors Brian Ferguson and Jenna Foster simply let him take time off whenever he needed to do so.  When Gabbard contacted Doug Berry about a possible accommodation, Berry referred him to DLS, which could assist Gabbard in obtaining an appropriate accommodation.  [*See* Record No. 34, p. 3.]

Although Gabbard discussed his anxiety with Nicole Kyte, their Chimes messages show that Gabbard attributed his missed work to allergies, home renovations, and oversleeping.  While an employee need not use "magic words" to do so, it is an employee's responsibility to request an accommodation and the employer is not required to speculate. *Gantt v. Wilson Sporting Goods Co.*, 142 F.3d 1042, 1046-47 (6th Cir. 1998)  In other words, "the employee must 'make it clear' both that he is making a request and that he is doing so because of his disability."  *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 416 (6th

---

[3]     Amazon does not appear to dispute that Gabbard had a disability, for purposes of its motion for summary judgment.

Cir. 2017).   There is no evidence to suggest that Gabbard ever told Kyte he needed an

accommodation based on his disabilities.

   To the extent he submitted formal requests for accommodation to DLS, the record is

clear that DLS responded promptly to Gabbard's requests and, with the exception of permitting

him to use his old laptop (which was against company policy), granted him every

accommodation he requested.

### 2.   Amazon provided reasonable accommodations.

   To establish a *prima facie* case of failure to accommodate under § 12112(b)(5)(A), an

employee must show: (1) he is disabled within the meaning of the ADA; (2) he is otherwise

qualified for the position, such that he can perform the essential functions of the job with or

without a reasonable accommodation; (3) the employer knew or had reason to know of his

disability; (4) the employee requested an accommodation; and (5) the employer failed to

provide a reasonable accommodation thereafter.   *Green v. BakeMark USA, LLC*, 683 F. App'x

486, 491 (6th Cir. 2017) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th

Cir. 2007)).   Once an employee establishes a *prima facie* case, "the burden shifts to the

employer to demonstrate that any particular accommodation would impose an undue hardship

on the employer." *Id.*

   Amazon contends that it is entitled to summary judgment with respect to this claim

because Gabbard cannot show that Amazon failed to provide him reasonable accommodations

in response to his requests.   Gabbard concedes that Amazon granted his requests for

intermittent leave and vocational coaching.   It appears that his claim is limited to Amazon's

refusal to allow him to continue using his laptop computer and preferred software after

Amazon implemented a new operating system in 2020.

- 15 -

"When a disabled employee requires accommodation, the employee bears the burden to propose a reasonable accommodation." *Arndt v. Ford Motor Co.*, 716 F. App'x 519, 527 (6th Cir. 2017). "A plaintiff 'need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases. Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237-38 (D.D.C. 2018).

On the other side of the coin, employers are not required to accommodate an employee in the exact way he or she requests. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996). Gabbard's proposed accommodation was to continue using his old laptop despite Amazon's systemic hardware upgrade. [*See* Record No. 32-2, p. 89.] But Gabbard's requested accommodation was not reasonable on its face. Amazon has provided testimony indicating that the computer change was part of a "systemwide hardware upgrade," and that the software could not be loaded onto the new computer due to Amazon's security policies.[4] [Record No. 32-3, p. 5]

As an alternative to Gabbard's proposed accommodation, Amazon allowed him to access his desired software and websites on a separate computer and provided many weeks of vocational training to assist him in maneuvering between the two systems. [Record No. 32-1, p. 108] Gabbard has failed to identify any reason why this accommodation was unreasonable.

---

[4]    Gabbard vaguely recalled the names of two employees he believed were still able to access websites using the old operating system "for a little while." [Record No. 32-1, p. 107] However, these individuals did not work in the same department as Gabbard and it is unclear that their alleged access to such websites was authorized by Amazon.

*See Hankins*, 84 F.3d at 800 (observing that an employer does not fail to provide a reasonable accommodation when there is more than one accommodation and the employer chooses one that is "less expensive," "easier to provide," or an accommodation other than the one the employee prefers). [*See id;* Plaintiff's Response Brief, Record No. 34.] Accordingly, the defendant is entitled to summary judgment with respect to this claim.

### B.  Wrongful Termination

The ADA prohibits discharging an employee on the basis of disability. 42 U.S.C. § 12112(a). A plaintiff can prove a claim for discrimination based on wrongful termination under the ADA through direct or circumstantial evidence. *See Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021). The parties agree that the plaintiff's claim is based on circumstantial evidence and the Sixth Circuit's modified version of the *McDonnell Douglas* burden-shifting framework applies. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

In such cases, the plaintiff must first establish a prima facie case by demonstrating that he: (1) has a disability; (2) is otherwise qualified for his position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants, or the plaintiff was replaced. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). If the plaintiff is able to establish a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is merely pretext for discrimination. *Id.*

Amazon skips the first step and cites Gabbard's poor performance as a legitimate, nondiscriminatory reason for terminating his employment.  Gabbard argues that this reason is pretextual.  A plaintiff typically demonstrates pretext in one of three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action."  *Miles v. South Central Human Res. Agency, Inc*., 946 F.3d 883, 888 (6th Cir. 2020).  But a plaintiff can show pretext in other ways.  The three categories are simply "a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'"  *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).  Gabbard does not point to particular evidence suggesting that Amazon's proffered reason is pretextual—he simply contends that it is.

It is undisputed that Gabbard had longstanding performance issues.  Jenna Foster placed him on a 60-day Development Plan in March 2019 based on the some of the same issues that led to his termination, including failure to complete projects and a lack of independence.  Gabbard exhibited these performance issues as far back as March 2019 even though he was using his preferred computer and software and, according to his deposition testimony, he was able to take time off whenever needed.

The Chime messages between Gabbard and Kyte reveal that, not only did Gabbard have serious attendance issues, he willfully disobeyed Kyte's directions with respect to reporting time off.  Gabbard testified that his previous managers had permitted him to simply log his time in a computer program without notifying them directly.  Kyte informed Gabbard that the computer program was used for tracking time off for payroll purposes and that it was not sufficient for purposes of notifying her of any absences.  Even after being informed of the

proper procedure repeatedly, Gabbard continued to exclusively log his time in the computer program, telling Kyte: "I thought for sure that would notify you to let you know that I entered time." [Record No. 32-2, p. 36]  Kyte understandably issued a Final Written Warning June 4, 2020.[5]

After returning to his ECR role, Gabbard was placed on another 60-day Development Plan on or around June 17, 2020.  Gabbard suggests that the Plan did not actually come about as the result of a routine mid-year review because the *Final Written Warning* did not mention "performance." [Record No. 34, p. 4]  But the Final Written Warning was limited to Gabbard's role as a CEI, whereas the Development Plan was based on his performance as an ECR. Further, the Final Written Warning *did* discuss his performance to the extent that he repeatedly failed to follow proper call-in procedures.  Gabbard further discounts the Plan because he had "only been in the ECR position for 13 days" since being returned to it on June 5, 2020. However, this is an inaccurate representation of the facts because Gabbard was an ECR from January 2020 until he took on the acting CEI role in April 2020.

The Development Plan highlighted several issues with Gabbard's work and indicated that he "ranked near the bottom of the ECR specialists based on the first half of his 2020 performance." [Record No. 32-3, p. 3]  The Development Plan was extended through June 2021 and Gabbard was still failing to meet various goals, despite his use of intermittent leave and vocational coaching.  [*See* Record No. 32-2.]  Gabbard's supervisors, particularly Martinez, sent him weekly emails summarizing the one-on-one meetings they had throughout

---

[5]     Gabbard erroneously argues that the Final Written Warning was inconsistent with the terms of his FMLA leave, which was backdated to May 4, 2020.  Although the time off would have been approved under his FMLA accommodation, he was still required to provide notice per his supervisor's instructions.

the duration of the Plan.  Although Gabbard showed improvement in some areas, he consistently had problems with communication and completing projects.  Although Gabbard blamed some of this on the loss of his laptop, he demonstrated the same performance deficiencies prior to the hardware upgrade.  Based on the accommodations of an additional computer with access to the same websites and software Gabbard had used previously, it is unclear why this change would affect his performance so severely.

Poor performance is a legitimate nondiscriminatory reason for termination.  *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 588 (6th Cir. 2002).  Gabbard has failed to present evidence indicating that Amazon's assertions concerning his performance are factually inaccurate or that the proffered reason was insufficient to motivate his termination.  *See Manzer*, 29 F.3d 1084 (noting that this showing usually "consists of evidence that other employees not in the protected class were not fired even though they engaged in substantially identical conduct").  Finally, Gabbard has failed to demonstrate that his performance did not actually motivate the adverse action.  If Amazon needed a pretext to fire Gabbard based on his disabilities, it had multiple opportunities to do so in 2019 and 2020.  *See Dudzinksi v. Spirit Airlines, Inc*., 2013 WL 1189701, at *7 (E.D. Mich. Mar. 4, 2013).  Instead, it continued his employment and provided him with opportunities to improve.  Gabbard's unsubstantiated belief that Amazon fired him because of his disability is not sufficient to raise a jury question on this issue.

## C.    Retaliation

The FMLA and ADA prohibit employers from retaliating against anyone who has makes a charge under the Act.  29 U.S.C. § 2615; 42 U.S.C.§ 12203(a).  "Retaliation" means that an employer would not have taken an adverse employment action "but for an employee's

statutorily protected activity." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (internal quotation marks omitted)).  To establish a prima facie case of retaliation under either Act, the plaintiff must show that he engaged in a protected activity, that the defendant subsequently subjected him to an adverse employment action, and there was a causal connection.  *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (applying ADA); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (applying FMLA).  If the plaintiff is able to establish a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretext for discrimination.  *Id.*

Amazon does not dispute that Gabbard engaged in protected activities when he requested and took his approved leave under the FMLA and when he requested accommodations under the ADA.  The plaintiff identifies the June 4, 2020, Final Written Warning and his termination as adverse employment actions.  An adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).  Examples include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (analyzing Title VII claim).

While the Final Written Warning does not satisfy these criteria, it did indicate that a failure to meet the expectations stated therein could result in immediate termination.  Accordingly, for the purposes of this motion, the Court will consider the Final Warning an

adverse employment action. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("The antiretaliation provision … prohibit[s] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC.'") (analyzing gender discrimination claim under Title VII of the Civil Rights Act of 1964).

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). In this case, no reasonable juror could conclude that Kyte issued the Final Written Warning based on Gabbard's request for FMLA leave. Gabbard had not initiated a formal FMLA request at the time Kyte issued the Final Written Warning and there is no evidence that she knew about his informal discussion with Berry. Further, Gabbard had six documented incidents the preceding month in which he admittedly violated the attendance policy. The only reasonable conclusion is that Kyte issued the Final Warning based on the attendance policy violations.

A jury also could not conclude that Gabbard was placed on a PIVOT or terminated based on his participation in protected activity. *See Kyle-Eiland v. Neff*, 408 F. App'x 933, 941 (6th Cir. 2011) (observing that performance improvement plan may constitute adverse employment action when it leads to termination). Construing the facts most favorably to Gabbard, he was placed on a PIVOT plan in October 2020, shortly after making an accommodation request with respect to his computer. Importantly, however, he was already on a Development Plan based on the same performance issues, which had previously been extended by 30 days. The record also indicates that Gabbard's supervisors were ambivalent about the computer situation. [Record No. 32-1, pp. 106-07]

Amazon's subsequent actions also belie Gabbard's assertion that he was retaliated against for seeking an accommodation. When Gabbard requested additional vocational coaching to assist him with his computer and software, he was given that accommodation and the PIVOT was paused until January 2021. Ultimately, Gabbard did not agree with the goals Amazon set for him but he has failed to identify any evidence suggesting that the goals were anything other than the average for all ECR specialists or that he was treated differently than any other ECR specialist.

### D.    Providing False Information for an Unemployment Claim

Gabbard alleges that Amazon provided false information to the Kentucky Department of Unemployment Insurance indicating that he voluntarily left his employment, which caused him to lose unemployment benefits and payments. [Record No. 1-1, p. 13] He has not identified a legal theory that entitles him to relief. Amazon requests summary judgment with respect to each of Gabbard's claims but failed to mention this claim specifically in its motion.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no issues of material fact regarding an essential element of the non-moving party's claim. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). This is not accomplished by a conclusory allegation that the plaintiff has no evidence to prove his claim. *Burton v. Ethicon Inc.*, 2020 WL 5809992, at *9 (E.D. Ky. Sept. 29, 2020) (citing *Sideridraulic Sys. SpA v. Briese Schffahrts GmbH & Co. KG,* 2011 WL 3204521, at *2 n.3 (S.D. Ala. July 26, 2011)). Instead, the movant must show that the available evidence establishes that there is no genuine issue of material fact. *Id.* (citing *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009)).

Amazon could have fulfilled its burden by making reference to materials on file and by pointing out the absence of specific facts that were required for the plaintiff's claim to succeed. But the defendant did not mention the claim involving false information at all. Therefore, Gabbard's obligation to respond with facts showing there *is* a triable issue on this claim was not triggered. Accordingly, the defendant's motion for summary judgment on this claim will be denied.

To the extent this claim can be read to allege a claim for retaliation, it necessarily fails. Both types of claims require the plaintiff to establish an adverse employment action which inherently occurs during the course of an employment relationship. *See Ellis v. Prospect Airport Servs.*, 2019 WL 2218819, at *4 (E.D. Mich. Jan. 25, 2019) (citing *Rogers v. Makol*, 2014 WL 4494235, at *4 (D. Conn. Sept. 4, 2014)). Accordingly, an employer's opposition to an unemployment compensation claim is not an adverse employment action. *Id. See also Novak v. Wolfe Paper Co.*, 2019 WL 1226847 (N.D. Ohio Mar. 15, 2019) (observing that employer could no longer retaliate against plaintiff after his employment was terminated); *Carr v. Bolin*, 2009 WL 2015129 (M.D. Tenn. July 7, 2009) (finding that former employee's false statement claim must arise under some state law theory).

Kentucky's unemployment compensation scheme prohibits witnesses from making false statements in the context of unemployment insurance proceedings. K.R.S. § 341.990(6)(a). While the false statement provision does not provide a private right of action, the Supreme Court of Kentucky has held that individuals may bring claims for violations of the provision pursuant to Kentucky's negligence per se statute, § 446.070 . *Hickey v. Gen. Elec. Co.*, 539 S.W.3d 19, 22 (Ky. 2018).

When all federal claims have been dismissed before trial, the best course is to remand the state law claims to the state court from which the matter was removed. *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 359 (6th Cir. 2004) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). Further, Kentucky courts are uniquely suited to resolve issues involving Kentucky's unemployment scheme. *See Hickey*, 539 S.W.3d at 25; *Wilson v. KUIC*, 2008 WL 2355724, at *2 (W.D. Ky. June 5, 2008).

### IV.    Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.    Defendant Amazon's motion for summary judgment [Record No. 32] is **GRANTED**, in part, and **DENIED**, in part. Each of Plaintiff Gabbard's discrimination claims, asserted under the FMLA, ADA, and KCRA, is **DISMISSED** with prejudice.

2.    This matter is **REMANDED** to the Bath Circuit Court for consideration of Gabbard's remaining claim regarding the defendant's alleged provision of false information to the Kentucky Department of Unemployment Insurance.

Dated: May 1, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky